UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.,

      Plaintiff,

   -against-          Civil Action No.: 07 CV 6986
                    (NRB)
HEALTHEXTRAS, INC.,

      Defendant.

------------------------------------------------------------X


**DEFENDANT'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY
<u>INJUNCTION OR, IN THE ALTERNATIVE, A WRIT OF REPLEVIN</u>**


OF COUNSEL:  ROBERT A. CALINOFF, ESQ.

LAW OFFICES OF CALINOFF & KATZ LLP
140 EAST 45TH STREET, 17TH FLOOR • NEW YORK, NY 10017-3144 • TEL: 212.826.8800 • FAX: 212.644.5123

## TABLE OF CONTENTS

PAGE:

TABLE OF AUTHORITIES......................................................................................iv, v

PRELIMINARY STATEMENT............................................................................1

FACTUAL BACKGROUND...................................................................................2

I.      HEI Conceived of and Developed the Supplemental
Health and Disability Benefit Program...............................................2

II.     Creation of the Marketing Agreement and Early
Operation of the Program.................................................................3

III.    AXP Seeks to Change the Underwriter for the
Program to its Own Affiliate............................................................5

IV.    The Letter Agreement was a Stopgap Side Agreement
to Address Certain Specific Issues....................................................6

V.     The Marketing Agreement Was Never
Terminated....................................................................................7

VI.    The Letter Agreement Contemplates the Existence
of the Marketing Agreement............................................................8

VII.   The Nature of the Present Dispute....................................................8

VIII.  The Alternative Dispute Resolution Procedure
in the Marketing Agreement...........................................................10

IX.    HEI Invokes the Alternative Dispute Resolution
Procedure and AXP Refuses to Comply...........................................10

i

ARGUMENT..............................................................................................................11

I.     AXP's Failure to Comply With a Condition Precedent
To Suit Precludes its Claims.......................................................................11

II.    AXP Must Demonstrate Irreparable Harm and a Clear
or Substantial Showing of Likelihood of Success to
Obtain a Mandatory Injunction...................................................................11

III.   AXP's Claims of Irreparable Harm are Conjectural,
Self Inflicted Damages................................................................................13

     A.     If the Court Maintains the Status Quo Pending
a Resolution on the Merits, AXP Will Not Be
Harmed, Much Less Irreparably Harmed................................14

     B.     Any Harm to AXP Pending the Resolution on
the Merits Will be Purely Self Inflicted.................................16

IV.   AXP Has Not Made a Clear and Substantial
Showing of a Likelihood of Success...........................................................18

     A.     The Marketing Agreement Has Not Terminated,
and Thus AXP Has No Contractual Right to Service
and Administer the HEI Program............................................18

           1.     The Marketing Agreement Was Not Terminated
in Accordance with its Terms.....................................18

           2.     The Letter Agreement Did not Terminate
the Marketing Agreement or Limit HEI's
Rights After its Expiration..........................................19

     B.     The Rights of the Parties to Posses the Information
AXP Seeks are Governed by the Marketing
Agreement, and the Marketing Agreement
Places the Right of Possession in HEI.....................................21

           1.     AXP Has No Right to Possess What
It Does Not Own.........................................................21

           2.     Ownership Does Not Equate to a Right
of Possession, and Right of Possession
Remains with HEI.......................................................22

ii

3.    AXP Cannot Establish an Exclusive
Right of Possession……………………………………...……23

CONCLUSION…………………………………………………………………...…..24

iii

00003863

# TABLE OF AUTHORITIES

**PAGE**:

*Arnold Weiss Corp. v. Manisha Sportswear, Inc.,*
    882 F.Supp. 58 (S.D.N.Y. 1991)……………………………………………...…...19

*Beck v. Manufacturers Hanover Trust Co.,*
    125 Misc.2d 771, 481 N.Y.S.2d 211, 218 (Sup. 1984)…………………………..……20

*Boczar v. Kingen,*
    1999 WL 33109074, at *11 (S.D. Ind. July 2, 1999)………………………………….17

*Brooklyn Ash Removal Co., Inc. v. Connell,*
    173 A.D. 5, 158 N.Y.S. 1034, 1035 (N.Y.A.D. 2nd Dept. 1916)………………….…..22,23

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
    68 F.3d 828, 839 (3rd Cir. 1995)………………………………………………...…...17

*CB Richard Ellis, Inc. v. Am. Envtl. Waste Mgmnt.,*
    No. 98-CV-4183 (JG) 1998 WL 903495 (E.D.N.Y. Dec. 4, 1998)………………...……11

*Citybank, N.A. v. Citytrust,*
    756 F.2d 273, 275 (2nd Cir. 1985)………………………………………...……13

*Consumers Prod. Co. v. Nuclear Fuel Services, Inc.,*
    509 F.Supp. 201, 211 (W.D.N.Y. 1981)………………………………………...…...19

*D.D. v. New York City Bd. Of Educ.,*
    465 F.3d 503, 510 (2nd Cir. 2006)………………………………………...……12

*Ellis v. Civil Service Employees Association,*
    1995 WL 779266 (N.D.N.Y. 1995)……………………………………….…………12,13

*Fiba Leasing Co., Inc. v. Airdyne Indus., Inc.,*
    826 F.Supp. 38, 39 (D. Mass. 1993)……………………………………………...…17

*Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,*
    865 F.2d 513, 518 (2d Cir. 1989)………………………………………….…………...19

*Fiore v. Fiore,*
    46 N.Y.2d 971, 973, 389 N.E.2d 138, 139 (1979)……………………….……………21

*General Supply and Construction Co. v. Goelet*
    241 N.Y. 28, 148 N.E. 778 (1925)………………………………………….…………19

iv

*Hoblock v. Albany County Bd. Of Elections,*
    422 F.3d 77, 97 (2nd Cir. 2005)……………………………………………..12

*Jackson Diary, Inc. v. H.P. Hood & Sons, Inc.,*
    596 F.2d 70, 72 (2d Cir. 1979)……………………………………...…………13,16

*KMW Int'l v. Chase Manhattan Bank, N.A.,*
    606 F.2d 10, 15 (2d Cir. 1979)……………………………………...…………15

*Lee v. Christian Coalition of America, Inc.,*
    160 F.Supp2d. 14, 33 (D.D.C. 2001)……………………………….…………17

*MONY Group, Inc. v. Highfields Capital Mgmt., L.P.,*
    368 F.3d 138, 143 (2nd Cir. 2004)…………………………….……………11

*Morrison v. Work,*
    266 U.S. 481, 490 (1925)……………………………………….....…………18

*Metallograph Corp. v. Arma Engineering Co., Inc.,*
    205 A.D. 100, 104, 199 N.Y.S. 347 (N.Y.A.D. 1st Dept. 1923)……………...………..20

*Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co.,*
    869 F.2d 23, 24 (2d Cir. 1989)……………………………………..…......…17,18

*San Francisco Real Estate v. Real Estate Invest. Trust of America,*
    692 F.2d 814, 818 (1st Cir. 1982)……………………………………..………16

*State of New York v. Nuclear Regulatory Comm'n,*
    550 F.2d 745, 755 (2d Cir. 1977)……………………………………...……15

*Sperry Int'l Trade, Inc. v. Gov't of Israel,*
    670 F.2d 8, 12 (2d Cir. 1982)……………………………………………16

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27, 33-34 (2nd Cir. 1995)…………………………………...………12

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,*
    736 F.Supp. 1282, 1284 (S.D.N.Y. 1990)…………………………………...……...20

v

Defendant, HealthExtras, Inc. ("HEI"), by its undersigned counsel and pursuant to Fed. R. Civ. P. 65, hereby opposes Plaintiff's Motion for Preliminary Injunction or, in the Alternative, a Writ of Replevin (the "Motion"), and states as follows:

## PRELIMINARY STATEMENT

Plaintiff American Express Travel Related Services Company, Inc. ("AXP") seeks affirmative injunctive relief from this Court requiring HealthExtras to provide additional data and information AXP claims to need in order to operate the HealthExtras Supplemental Health and Disability Benefit Program (the "HEI Program") that is the subject of this litigation. What AXP is really requesting is the compelled disclosure of information showing AXP how to manage and operate the HEI Program[1]; thereby allowing AXP to assert ownership over the HEI Program without the compensation to HealthExtras provided for by the revenue sharing formula previously agreed to by the parties. AXP is not entitled to the relief it seeks by way of a preliminary injunction, or alternatively, a writ of replevin.

The Second Circuit has held that irreparable harm is an injury for which a monetary award cannot be adequate compensation, and is the most important prerequisite for the issuance of a preliminary injunction. If the *status quo* is maintained pending a full resolution on the merits in this case, AXP will suffer no harm that could not easily be redressed by the payment of money; i.e., AXP's purported cost savings through self administration of the HEI Program. Accordingly, it is submitted that if the Court finds that AXP could be adequately compensated for such alleged loss by a monetary award, the Court's inquiry should end and AXP's motion for

---

[1] As discussed in section VII of the Factual Background, *infra*, HEI continues to provide the reports and data to AXP to which it is contractually entitled. HEI has not changed the nature of the information provided or withheld from AXP any of the data or information HEI has historically provided to AXP during the preceding eight years that the HEI Program has successfully operated.

1

preliminary injunction should be denied.  Similarly, AXP has failed to meet the substantial burden to obtain the alternative relief of an immediate writ of replevin prior to a hearing on the merits to determine its purported right to exclusive possession of the information sought.

## FACTUAL BACKGROUND

**I.     HEI Conceived of and Developed the Supplemental Health and Disability Benefit Program.**

The HealthExtras' Supplemental Health and Disability Benefit Program (the "HEI Program" or "the Program") that is the focus of this litigation was conceived and developed by HEI beginning in 1997.  *Affidavit of David T. Blair* ("*Blair Affidavit*"), ¶ 2.  The previous year, the late Christopher Reeve had suffered a horrific spinal cord injury that quickly depleted the limits of his health insurance coverage.  His injury highlighted a shortcoming with traditional healthcare coverage in the event of a catastrophic injury – i.e., that traditional healthcare insurance has a lifetime limit on benefits that can be quickly exhausted in the event of a catastrophic injury and that increasing the lifetime coverage limit is costly.

HEI's founders set out on a three year process to develop a low cost supplemental health and disability program.  *Id*.  The effort entailed, among other things, conducting market research, entering into an agreement with Christopher Reeve and his foundation to endorse the Program and to serve as its exclusive spokesperson, development of the package of excess medical and catastrophic disability benefits, contracting with the insurance underwriters and a licensed insurance broker, preparing the marketing solicitations and establishing the consumer marketing channels through financial institutions that issue credit cards.  *Id*.  The cost to develop the program was initially funded by the private investors of HEI, and was later augmented by the proceeds of a public stock offering.  *Id*.

The composition of the final product consisted of underwritten and non-underwritten benefits including an accidental permanent total disability insurance coverage, an out-of-area emergency accident and sickness medical benefit, an accidental loss of life insurance benefit, medical evacuation and a 24 hour nurse-on-call service. *Id*. Pricing to consumers for the HEI Program was very modest - roughly ten dollars ($10.00) to fifteen dollars ($15.00) per month depending on the benefit level selected by the purchaser. *Id*. ¶ 3. Once the structure of the HEI Program had been finalized, HEI then contracted with various credit card issuing financial institutions to market the HEI Program utilizing statement inserts, direct mail and telemarketing. *Id*. Consumers wishing to obtain the offered benefits are enrolled as members of the HEI Program and pay their program fees directly to HEI. *Id*. HEI then pays a portion of the revenues received to the financial institution that solicited its cardholder's participation. From the portion of the revenue it retains, HEI pays the various insurance premiums (via the licensed insurance broker), the contractors for the non-underwritten benefits, the fee to the designated Reeve foundation for Christopher Reeve's endorsement of the HEI Program and the expenses associated with the marketing campaigns that yielded the HEI Program Enrollees. *Id*.

The level of involvement of participating financial institutions generally was limited to selecting the cardholders for solicitation based solely on the institution's own criteria, and thereafter providing HEI with the enrolled cardmember's identity and credit card information for billing purposes. AXP's initial participation in the HEI Program began in this manner.

## II.    Creation of the Marketing Agreement and Early Operation of the Program.

HEI first approached AXP about entering into an agreement to market the HEI Program to its cardmembers sometime in 1998. AXP initially declined to participate. However, after Citicorp and other of AXP's competitors signed on, AXP reconsidered its initial decision the

following year and contacted HEI about entering into a contract. *Id.* ¶ 4. The ensuing negotiations resulted in the September 17, 1999 Marketing Agreement, which was drafted by AXP. *Id.* ¶ 4, Ex. A.

The Marketing Agreement begins by specifying that HEI owns the HEI Program and that AXP wishes to make it available to its cardholders, albeit private labeled under the AXP name:

1 (a) As used herein:

- the "Accidental Disability Plan" or "Plan" shall mean the insurance service to be branded under the name "American Express Accidental Disability Plan" *offered by HEALTHEXTRAS to [Amex] Customers in accordance with the terms hereof;"*

*Id.*, Ex. A, § 1(a)(emphasis added). In subparagraph 1(b), the Marketing Agreement further provides:

(b) In accordance with the terms and conditions set forth herein, ***AMEX hereby retains HEALTHEXTRAS, and HEALTHEXTRAS hereby agrees, to provide*** the Accidental Disability Plan to Customers. The parties will be compensated for their services in accordance with Section 3.

*Id.*, Ex. A, § 1(b)(emphasis added). Under section 3 of the Marketing Agreement, AXP received 22% of the revenues from single Enrollees and 24% from additional Enrollees within the same household as the primary Enrollee. *Id.*, Ex. A, § 3. The fee converted to a flat 24% of revenue once the total Enrollee base reached 100,000 persons. *Id.* AXP was paid its percentage fee from the cardholder payments and the balance was retained by HEI from which it paid the insurers, the marketing costs, the fees owed in connection with the Christopher Reeve endorsement, and other related costs. *Id.* ¶ 4. HEI retained the residual revenues after payment of the costs.

The initial marketing efforts for the HEI Program were so successful that by April, 2002, the AXP enrollee population had reached 150,000 members. *Id.* ¶ 5. It was at that point that HEI recommended to AXP that it could increase its share of the revenue under the HEI Program by assuming direct responsibility for the marketing. *Id.* Under paragraph II of Exhibit C to the

Marketing Agreement, "Amex reserve[d] the right to commence marketing of the program in lieu of HealthExtra's marketing efforts." *Id.* ¶ 4, Ex. A, Exhibit C ¶ 2. Pursuant to this provision, the parties entered into a written amendment effective May 1, 2002, whereby AXP would pay the direct marketing costs of any new mailing and/or telemarketing solicitation campaigns to its cardholders. *Id.*, Ex. A. HEI continued to pay the premium to the insurers, the Christopher Reeve Endorsement fee and other costs of the Program. *Id.* The revenue formula for Enrollees acquired when HEI paid the direct marketing costs remained the same. However, the parties adjusted the revenue sharing formula going forward for future campaigns funded by AXP. For those marketing campaigns, AXP received 50% of the revenues generated from new Enrollees. *Id.* ¶ 5. Aside from the change with respect to future marketing campaigns, the roles and responsibilities remained unchanged. *Id.*

**III.    AXP Seeks to Change the Underwriter for the Program to its Own Affiliate.**

Beginning in the fall of 2005, AXP expressed a desire to change the underwriter for the HEI Program to Amex Assurance Company, which was represented at the time as being an affiliate of AXP. *Id.* ¶ 6. Under paragraph I of Exhibit C of the Marketing Agreement, entitled "Underwriting", AXP reserved to itself ". . . the right to change the underwriter of the accidental disability portion, or other portions, of the Accidental Disability Plan, including but not limited to having any portion of the program underwritten or provided directly by AMEX or one of its affiliated entities . . . ." *Id.*, Ex. A, Exhibit C ¶ 1. During the referenced time period, AXP requested and received HEI's assistance with drafting a group disability policy that conformed to the parameters of the HEI Program and with identifying and complying with the various state regulatory filings that would be necessary to have the policy approved.

In December 2005, AXP notified HEI that it wanted to effectuate the change in the underwriter for the disability insurance program to its "affiliate," Amex Assurance Company by

March, 2006.  *Id.* ¶ 6.   Upon learning of its imminent plans to change underwriters, HEI informed AXP that several critical pre-conditions for such a change had not been met, and therefore the proposed change could not go forward.[2]  *Id.* ¶ 6, Ex, B.   In response, AXP announced that it intended to terminate the Marketing Agreement thereby negating any obligation to satisfy the requirements of the Agreement for changing the underwriter.  AXP also made clear that upon termination, it no longer intended to honor the revenue sharing formula.  *Id.* ¶ 7.   HEI thereafter invoked the dispute resolution procedure set forth in the Marketing Agreement.  *Id.*  The parties met on May 2, 2006 in New York City and again on June 9, 2006 in Washington, D.C.   The byproduct of the meetings was the Letter Agreement dated June 23, 2006.  *Id.* ¶ 8.

## IV.    The Letter Agreement was a Stopgap Side Agreement to Address Certain Specific Issues.

The principal provisions of the Letter Agreement were to: (i)  permit AXP to change the underwriter to Amex Assurance; (ii) modify the revenue sharing formula for a 15 month period; (iii) agree to negotiate in good faith a more Definitive Agreement regarding AXP's desire to acquire the revenue stream associated with the existing Enrollee base acquired under the HEI Program using the Christopher Reeve endorsement; and (iv) acquire the right to use the HEI developed marketing materials in future marketing campaigns.  *Id.*  The Letter Agreement did not terminate the underlying Marketing Agreement, but rather specifically contemplated that a more Definitive Agreement would be needed to supersede the Marketing Agreement.  *Id.*  It did not provide for transfer of ownership of the HEI Program or the Enrollees to AXP, and it did not change the parties' revenue sharing formula beyond December 31, 2007.  *Id.*  Most critically, it

---

[2] Among the deficiencies were: (i) Amex Assurance could not match the premium pricing of the current underwriter; (ii) AXP could not provide copies of state policy filings and necessary state insurance department approvals; and (iii) AXP could not establish that Amex Assurance Company was truly an affiliate.

did not state that HEI would stop receiving its share of revenue upon expiration of the Letter Agreement, or that the parties' relationship would end at that point. *Id.*

## V.    The Marketing Agreement Was Never Terminated.

The Marketing Agreement had an initial term of two (2) years and, thereafter, automatically renewed for successive one year terms, "unless AMEX, in its sole discretion, elect[ed] to terminate as of the end of any initial term or any renewal term by providing HEALTHEXTRAS with at least sixty (60) days written notice prior to the expiration of the initial term or prior to the expiration of any renewal term." *Id.* ¶ 4, Ex. A, § 18(a).  The Notice provision of the Marketing Agreement provides that all notices shall be given in writing and delivered by personal delivery, by certified or registered mail (return receipt requested), by nationally recognized courier or, only with permission of the recipient, by facsimile.  *Id.*, Ex. A, § 17.  For notice to HEI, written notice had to be delivered to David Blair, HEI's CEO.  *Id.*

AXP never provided written notice of termination of the Marketing Agreement, and it remains in force and effect today, through at least September 16, 2008.  AXP alleges that "[i]n early 2006, AXP notified HealthExtras of its *intention to elect* to terminate the Marketing Agreement effective September 16, 2006 at the end of the then current renewal term."  Compl., ¶ 16 (emphasis added).  The wording of this sentence is telling: AXP does not allege that it provided written notice of termination in accordance with the terms of the Marketing Agreement. It alleges that it provided notice of "its intention to elect" to terminate.  In other words, AXP told HEI that it had the *intention* to provide notice of termination.  The present intent to take action in the future does not mean such action was actually taken.  Interestingly, despite the voluminous paper attached to AXP's Complaint and Motion for Preliminary Injunction, AXP does not

provide the Court with a copy of written notice from AXP terminating the Marketing Agreement. This is no oversight - no such document exists.

## VI.    The Letter Agreement Contemplates the Existence of the Marketing Agreement.

The Letter Agreement does not indicate that the Marketing Agreement is terminated or superseded; to the contrary, the language of the Letter Agreement contemplates the continuing existence and applicability of the Marketing Agreement:

- The "re" line provides that it is a Letter Agreement "relating to the Marketing Agreement";

- The introductory paragraph provides that the purpose of the Letter Agreement is to set forth certain binding agreements and nonbinding understandings *with respect to the terms of the Marketing Agreement*;

- Paragraph 1 provides that following conversion of the HEI Program's underwriter, HEI will continue to service the Enrollees *as provided under the Marketing Agreement*;

- Paragraph 3 provides that AXP would pay HEI in accordance with the time frames and processes *currently followed under the Marketing Agreement*;

- Paragraph 10 provides that in the event of a breach of the Letter Agreement, the non-breaching party has the right to pursue all rights and remedies that may exist under the Letter Agreement *or the Marketing Agreement, or both*;

- Finally, in paragraph 11, the Letter Agreement provides that if the parties execute a further "Definitive Agreement," that document would supersede the Letter Agreement *and the Marketing Agreement*. (Obviously, if the Marketing Agreement had terminated, or had already been superseded, this clause of the Letter Agreement would be nonsensical and moot.)

*Campling Decl.* ¶ 5, Ex. C.  By its express terms and intent, the Letter Agreement contemplated the continuing existence of the Marketing Agreement until such time as the Marketing Agreement was terminated in accordance with its terms.  No such termination has occurred.

## VII.    The Nature of the Present Dispute.

AXP alleges that it is entitled to an affirmative injunction because critical information is being withheld by HEI that AXP needs to operate the HEI Program.    AXP's contention is

without merit.  AXP has been routinely receiving data and reports from HEI since the inception of the parties' agreement in 1999, and it continues to receive the data and reports at regularly scheduled intervals and in a format that the parties have had in place for a long period of time. *Blair Affidavit* ¶ 4.  There has been no change to the data exchange or information reporting provided to AXP  by HEI and the HEI Program continues to operate normally.

What AXP seeks in its Motion is not simply its Customer cardmember base, but also HEI's proprietary information system for managing the HEI Program.  AXP is seeking through this injunction proceeding a Court order compelling HEI to show AXP how to manage and operate the HEI Program, relief to which it has no legal claim.    Fatal to AXP's plan is the fact that the Marketing Agreement between the parties defines the HEI Program as belonging to HEI. *Id.* ¶ 4, Ex. A §1.  It also specifies that any AXP "Customer" who answered a solicitation to participate in the HEI Program became an Enrollee or member of the HEI Program.  *Id.* ¶ 4, Ex. A §3.  AXP now tries to obscure the distinction between its Customer cardmember base (which is owned by AXP) and members of the HEI Program who are defined as Enrollees (which are owned by HEI).  *Id.*  AXP does not point to any contractual provision or other authority to support its position that it has the right to take ownership of the HEI Program.  Instead, AXP attempts to use this injunction proceeding as a means of altering the parties' current contractual agreement. It comes as no surprise that AXP's Motion still fails to specify the items to which they claim ownership and the contractual basis for such claim.

Finally, AXP's claim that its affiliate, Amex Assurance, "needs" to take over operational control or servicing of the HEI Program is inaccurate.  AXP cannot point to any provision in the parties' agreement that authorizes or otherwise allows the insurance underwriter, Amex Assurance Company, to "take over the servicing function" effective January 1, 2008.  See Kohler

affidavit at paragraph 2. To the contrary, Amex Assurance Company only serves as the underwriter of the HEI Program by virtue of a contract between HEI and Amex Assurance effective as of September 1, 2006. AXP is not a party to that underwriting agreement. Moreover, the underwriting agreement between HEI and Amex Assurance Company expires by its own terms on December 31, 2007, and Amex Assurance Company will have no further role in connection with the HEI Program absent a new agreement between HEI and Amex Assurance Company.

## VIII.   The Alternative Dispute Resolution Procedure in the Marketing Agreement.

Section 20(e)(iv) of the Marketing Agreement provides:

> In the event of a dispute arising out of or relating to this contract or the breach, termination or validity thereof, which has not been resolved by non-binding means as provided in subsection (i) and (ii) above within sixty days of the initiation of such procedure, either party may seek any remedy available at law or equity, including recourse to the courts.

*Blair Affidavit* ¶ 4, Ex. A § 20(e)(iv). Subsections (i) and (ii) of section 20(e) contain a mandatory executive meeting and negotiation process designed to achieve an amicable resolution to any dispute concerning the Marketing Agreement. Furthermore, subsection 20(e)(iii) provides a mandatory mediation process in the event the executive negotiation process does not result in a resolution: "If the above referenced dispute has not been resolved by negotiation as provided above, the parties shall endeavor to settle the dispute by mediation . . . ." *Id.*, Ex. A § 20(e)(iii).

## IX.   HEI Invokes the Alternative Dispute Resolution Procedure and AXP Refuses to Comply.

HEI has requested AXP to comply with the dispute resolution procedures of the Marketing Agreement three times. Each time, AXP has refused without justification to participate. *Id.* ¶¶ 11-13. First, on May 29, 2007, David Blair, HEI's Chief Executive Officer, advised AXP that HEI elected to invoke the executive negotiation process under the dispute

resolution procedures. *Id.* ¶ 1, Ex. C. On June 15, 2007, AXP "rejected the contention" that the procedures apply, and stated that "executive level meetings are not necessary." *Id.* ¶ 12, Ex. D. Second, on July 20, 2007, Joseph Mott, Deputy General Counsel for HEI, repeated HEI's request for an executive meeting. *Id.* ¶ 12, Ex. G. No response was received. Third, and finally, on August 7, 2007, Mr. Mott again requested AXP to comply with the dispute resolution procedures. *Id.* ¶ 13, Ex. H. The next day, AXP, through counsel, again "reject[ed] the contention" that the dispute resolution procedures applied. *Id.* These provisions are not without significance – they reflect the concern for a Program that affects the lives of hundreds of thousand Enrollees and that the disputes, therefore, should not be litigated in the public domain.

## ARGUMENT

### I.    AXP's Failure to Comply With a Condition Precedent to Suit Precludes its Claims.

The Marketing Agreement, upon which AXP's claims of declaratory judgment and replevin are based, contains a mandatory alternative dispute resolution clause that requires executive negotiation and then mediation as an express precondition to any lawsuit. *Id.* ¶ 4, Ex. A § 20. AXP has ignored and failed to comply with the alternative dispute resolution procedure in the Marketing Agreement, and its failure to do so alone defeats AXP's request for a preliminary injunction. *Id.* ¶¶ 11-13. *See CB Richard Ellis, Inc. v. Am. Envtl. Waste Mgmnt.*, No. 98-CV-4183 (JG) 1998 WL 903495, at *2 (E.D.N.Y. Dec. 4, 1998).

### II.    AXP Must Demonstrate Irreparable Harm and a Clear or Substantial Showing of Likelihood of Success to Obtain a Mandatory Injunction.

To secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, "and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d

138, 143 (2d Cir. 2004)(internal quotation marks omitted).  A party moving for a mandatory injunction that alters the *status quo* by commanding a positive act, as AXP seeks here, must meet a <u>higher</u> standard.  *D.D. v. N. Y. City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)(citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)).

AXP seeks to have this court intervene to transfer certain documents and information without complete resolution of the various issues in dispute between the parties.  In doing so, it seeks to alter radically the *status quo* between the parties and thereby endangers the future of the Program for both AXP and HEI.  Where the movant seeks a mandatory injunction (one that will alter the *status quo*) rather than a prohibitory injunction (one that maintains the *status quo*), the "likelihood of success" standard is elevated.  The movant must show a "clear or substantial likelihood of success."  *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2nd Cir. 2005); *Tom Doherty Assocs.*, 60 F.3d at 33-34.

This enhanced standard was analyzed in detail by Judge Scullin in the Northern District case *Ellis v. Civil Service Employees Association*, 1995 WL 779266 (N.D.N.Y. 1995), another case involving a preliminary injunction seeking the transfer of records.  Judge Scullin reasoned:

> As stated above, plaintiff brought this action seeking both a preliminary and a permanent injunction ordering the defendants to provide him with CSEA financial records.  Such a preliminary injunction would be deemed a "mandatory injunction," that is, one that "alters the status quo by commanding a positive act" [citing case].  In addition, such preliminary injunction would serve to provide plaintiff with virtually all the relief that is sought in the complaint.  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2nd Cir. 1985).  In fact, in *Tom Doherty*, the Second Circuit specifically stated that a heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless... [such as] a case involving the disclosure of confidential information.  The bottom line is that if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard, *Tom Doherty*, 60 F.3d at 35. The higher standard applied by the Second Circuit in the situations outlined above requires a "substantial, or clear showing of, likelihood" that the movant is entitled to the requested relief.  *Id.*  Additionally,

when the movant seeks a "mandatory injunction," he or she must show that "extreme or very serious damage will result from a denial of preliminary relief." *Abdul Wali*, 754 F.2d at 1025.

*Ellis*, 1995 WL 779266 at *5-6. AXP failed to address this heightened standard in its Motion, and unquestionably fails to meet it.

AXP's request for a mandatory injunction also fails to provide the Court the necessary specificity required for such relief. Rule 65(d) requires that:

> "Every Order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to complaint or other document, the act or acts sought to be restrained;"

Nowhere in its motion or verified complaint does AXP set forth with any specificity the items which it allegedly transferred to HEI nor concomitantly, the specific items for which it seeks return. Curiously, the declaration of Micki C. Koehler at page two (2) sets forth a list of items which AXP seeks herein. However, there is no statement that any of those specific items were ever the property of AXP, nor is the Court given any legal basis for AXP's alleged entitlement to such information. AXP's failures prevent the Court, even if it were inclined to award such relief, from crafting a preliminary injunction with requisite specificity.

**III.    AXP's Claims of Irreparable Harm are Conjectural, Self-Inflicted Damages.**

Irreparable harm has been defined generally as an "injury for which monetary award cannot be adequate compensation," *Jackson Diary, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979), and characterized by the Second Circuit as "perhaps the most important prerequisite for the issuance of a preliminary injunction . . . ." *Citybank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2nd Cir. 1985). A close analysis of each of AXP's claimed "irreparable harms" reveals that they are wholly speculative, self-inflicted damages, and that if this Court maintained

the *status quo* pending a resolution on the merits, and the merits favored AXP, any harm to AXP would be purely financial and easily redressed by a monetary award.

**A.    If the Court Maintains the *Status Quo* Pending a Resolution on the Merits, AXP Will Not be Harmed, Much Less Irreparably Harmed.**

In order to evaluate AXP's contentions, one must assess the *status quo*. Significantly, AXP does not allege that HEI is not properly performing its servicing functions under the HEI Program currently (or historically). Furthermore, AXP does not allege that its goodwill or reputation is in any way being damaged by HEI's servicing and administration of the HEI Program; in fact, the contrary is true. The HEI Program, as serviced to date by HEI, has been a success for AXP, and it is that success which fuels this lawsuit. It is because the HEI Program, as developed and administered by HEI, has been so successful that AXP now wants to appropriate the entire Program revenue stream for itself.

AXP contends that, if the status quo is maintained and an injunction is not issued, the following harm would befall AXP: First, AXP states that if it does not immediately receive the requested information from HEI, "it will not be possible to service and administer the Plan effectively." Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, or in the Alternative, a Writ of Replevin ("AXP Memo"), at p. 9. Second, AXP believes that if it does not immediately receive this information, it "places in substantial jeopardy the hard-earned relationship that AXP has forged and established with its customers." *Id.* Third, AXP states that "[t]he 150,000 Enrollees in the Plan may have their service disrupted if AXP does not receive the demanded information . . . ." *Id.* at 13 (AXP couches this as a public interest argument). Each of these so-called irreparable harms is illusory.[3]

---

[3] While section 11(f) of the Marketing Agreement provides that the unauthorized use of either parties' "Confidential Information" would constitute irreparable harm, AXP has neither alleged, nor could it in good faith allege, that the

If this Court does not issue the requested injunction, HEI will continue servicing and administering the HEI Program in the same competent and efficient manner that it has for the past eight years. Enrollees will see absolutely no difference in the Program from their perspective. AXP can, if it so chooses, continue to market the Program and subscribe new Enrollees to boost Program revenue. There will be no disruption in service, AXP will suffer no loss of goodwill or relationship because the HEI Enrollees will receive the same level of high-quality service, and the rights and positions of the parties will be maintained. Irreparable harm may not be remote or speculative, but must be actual and imminent. *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 15 (2d Cir. 1979)(citing *State of N. Y. v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir. 1977). If no injunction issues, and pending a resolution on the merits, HEI continues to service and administer the HEI Program, no "actual" or "imminent" harm to AXP will result.

If no injunction issues, and no settlement is reached through the alternative dispute resolution process, this Court will proceed to adjudicate the merits of this action after the parties have had the opportunity to conduct full discovery, file dispositive motions and, if merited, conduct a trial, all in accordance with the Federal Rules. If this Court ultimately determines that HEI is correct, and that the Marketing Agreement remains in force and effect, and assuming AXP has continued to honor its obligations under that Agreement, then the Parties will be able to continue their relationship into 2008 and the Parties and the Program will suffer no adverse consequences.

If, however, the Court ultimately determines that AXP is correct, and that AXP had the right to service and administer the HEI Program effective January 1, 2008, then the only harm

---

demanded information related to Enrollees of the HEI Program at issue in the lawsuit constitutes "Confidential Information" under the Marketing Agreement.

AXP will have suffered in the interim is the cost it has paid to HEI from January 1, 2008 to the time of the ruling, which cost is a purely economic damage.[4]  The law of the Second Circuit is well settled that, absent an exceptional case, financial loss is not irreparable harm:

> [I]t has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages (are) adequate compensation a preliminary injunction will not issue.

*Jackson Diary*, 596 F.2d at 72.  *See also Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) ("Thus, if it appears that the potential harm to the moving party is simply a monetary loss, the potential injury is normally not deemed irreparable and hence does not justify injunctive relief.").  Moreover, if the Court ultimately rules in AXP's favor, HEI and AXP can conduct an orderly transition that will ensure no disruption of service to Enrollees.

**B.  Any Harm to AXP Pending the Resolution on the Merits Will be Purely Self-Inflicted.**

The parade of horribles AXP foresees in its motion papers are purely speculative future outcomes that could only arise if, instead of maintaining the *status quo*, AXP unilaterally decides to try to service and administer the HEI Program on its own before the Court has ruled that it has the right to do so.  If AXP takes that action while this case is pending, then it runs the risk of harming the HEI Program.  But that risk, and any resulting harm, is entirely within AXP's control.  If AXP takes unilateral action prior to the Court's ruling on the merits, and that action causes AXP harm because AXP is "unable to service the Plan properly due to a lack of full information," AXP Memo, at 14, that harm would be entirely <u>self-inflicted</u>.  It is well-settled that prospective self-inflicted harm is not "irreparable harm" for the purposes of a preliminary injunction.  *See S. F. Real Estate v. Real Estate Invest. Trust of Am.*, 692 F.2d 814, 818 (1st Cir.

---

[4] Upon expiration of the Letter Agreement on December 31, 2007, the revenue split between the parties will revert to the arrangement set forth in the Marketing Agreement, as amended, as it existed prior to the Letter Agreement.

1982); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir. 1995); *Lee v. Christian Coalition of Am., Inc.*, 160 F.Supp2d. 14, 33 (D.D.C. 2001); *Boczar v. Kingen*, 1999 WL 33109074, at *11 (S.D. Ind. July 2, 1999); *Fiba Leasing Co., Inc. v. Airdyne Indus., Inc.*, 826 F.Supp. 38, 39 (D. Mass. 1993).

In addition, if we are to assume, *arguendo*, that AXP's artificial construct date of October 1, 2007, for the transfer of the documentation is viable, AXP has woefully delayed in bringing this proceeding. This delay underscores the fact that AXP's claims are not of an emergent nature. The self induced hysteria created by AXP herein seeks to create an emergency from commercial issues that have been swirling around the parties for approximately eighteen months. The pendency of this dispute was noted by David T. Blair, Chief Executive Officer of HEI, in his May 29, 2007 letter to Naeemah Ruffin of AXP, wherein he commented, "...this issue has been lingering for nine months with Amex continuing to refer to its claim as a specter of breach." Blair Affidavit, ¶ 11, Ex. C. He further stated:

> Due to the length of time this issue has remained open as well as the lack of any progress toward a resolution, please consider this letter to be notice to Amex that a dispute has arisen between the parties, and HealthExtras is electing to invoke the executive negotiation process under the dispute resolution procedure called for under section 20(e) (i) of the 1999 Marketing Agreement.

*Id.* AXP seeks to sever the issue regarding the documents and information from the larger dispute remaining between the parties, insincerely claiming that a particular portion of the larger dispute is emergent in nature. In point of fact, had AXP moved with any diligence to resolve the larger issues in accordance with HEI's alternative dispute resolution demand and, if that failed, instituted a timely suit, the issue before this Court would have been resolved as well. The Second Circuit has for many years disfavored the granting of "Eleventh Hour Motions for Preliminary Relief" where plaintiff's own delay "is the very source of the irreparable harm or imbalance of hardships claimed by them." *Nassau Boulevard Shell Serv. Station, Inc. v. Shell*

*Oil Co.*, 869 F.2d 23, 24 (2d Cir. 1989).  In this case, not only is there no irreparable harm if the Court maintains the *status quo*, but any perceived urgency is entirely of AXP's own making and should not be grounds for extraordinary relief.

A mandatory injunction has been characterized by the Supreme Court as an "extraordinary remedial process . . . ." *Morrison v. Work*, 266 U.S. 481, 490 (1925).  AXP has not met its substantial burden to demonstrate why this extraordinary process must occur while this Court considers the merits of AXP's claims.  As of the date of this briefing, the HEI Program is a fully-functioning successful accidental disability program, and absolutely no irreparable harm will befall AXP if the HEI Program remains in its current state until such time as the parties' contractual rights are settled.

## IV.    AXP Has Not Made a Clear and Substantial Showing of a Likelihood of Success.

### A.    The Marketing Agreement Has Not Terminated, and Thus AXP Has No Contractual Right to Service and Administer the HEI Program.

AXP's claims hinge on its argument that the Marketing Agreement has terminated, and thus AXP has the right to demand return of data it claims to be its own, to take over servicing and administering the HEI Program, and to cut HEI out of the Program HEI developed.  AXP has not made a "clear and substantial showing" that it will succeed in that claim, however, because AXP cannot prove that it gave HEI notice of termination in accordance with the terms of the Marketing Agreement, or that the Marketing Agreement was extinguished by novation, rescinded or cancelled.

### 1.    The Marketing Agreement Was Not Terminated in Accordance With its Terms.

As noted above, the Marketing Agreement contains very specific termination and notice requirements.  AXP does not allege in its Complaint, much less show in its motion papers, that it provided notice of termination in accordance with the terms of the Marketing Agreement, and it

certainly will never prove such notice. The failure to terminate the Marketing Agreement in accordance with its terms is fatal to AXP's claims. "Under New York law, . . . [w]here the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989)(quoting *Consumers Prod. Co. v. Nuclear Fuel Services, Inc.*, 509 F.Supp. 201, 211 (W.D.N.Y. 1981), quoting *General Supply and Construction Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925)).[5]

In *Arnold Weiss Corp. v. Manisha Sportswear, Inc.*, 882 F.Supp. 58 (S.D.N.Y. 1991), this Court considered a claim regarding improper notice of termination for an automatically renewing contract. The contract between the parties provided that it would automatically renew for one year terms unless one party provided written notice of cancellation 120 days prior to the renewal date. The defendant provided written notice of termination, but less than 120 days prior to the date of renewal. The Court concluded that the contract was clear and unambiguous and defendant had failed to comply with its express terms. As a result, the contract renewed for another year. *Id.* at 59-60. In this case, AXP has never provided proper written notice of termination of the Marketing Agreement, and the termination clause is equally unambiguous. AXP's failure to comply with the terms of the Marketing Agreement renders any purported termination it asserts wholly inoperative.

### 2.    The Letter Agreement Did Not Terminate the Marketing Agreement or Limit HEI's Rights After its Expiration.

Also as set forth above, to the extent AXP is arguing that the Letter Agreement terminated or superseded the Marketing Agreement, that argument is not supported by the text of the Letter Agreement or the law. The text of the Letter Agreement does not state that it

---

[5] New York law governs the Marketing Agreement. *Blair Affidavit*, ¶ 4, Ex. A § 20(f).

terminates or supersedes the Marketing Agreement, and as HEI has explained, the text actually contemplates the continued existence of the Marketing Agreement. AXP is not likely to succeed on any argument to the contrary, because New York law carefully and clearly provides that a court will not cancel, rescind or novate a contract without the clearest expression of a party's intent to do so. *See Metallograph Corp. v. Arma Eng'g Co., Inc.*, 205 A.D. 100, 104, 199 N.Y.S. 347 (N.Y.A.D. 1st Dept. 1923)("It is well-settled law that the cancellation or rescission of a contract must be clearly expressed."); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F.Supp. 1282, 1284 (S.D.N.Y. 1990)(indicating that party must have a "clear and definite intention" to novate, and stating that "a novation must never be presumed.")(citing *Beck v. Manufacturers Hanover Trust Co.*, 125 Misc.2d 771, 481 N.Y.S.2d 211, 218 (1984)). If the parties had the intention that the Letter Agreement terminate or novate the Marketing Agreement, why would the Letter Agreement expressly provide that any future "definitive agreement" between the parties would supersede both it and the Marketing Agreement?

If AXP argues that the Letter Agreement modified the term of the Marketing Agreement, or somehow set an end date for HEI's involvement in the HEI Program (*see* Complaint, ¶¶ 20-23), that argument fails due to the express text of the Letter Agreement.[6] As the multiple references to the Marketing Agreement in the Letter Agreement demonstrate, the Parties were fully capable of specifically referring to the Marketing Agreement where necessary. In the "Term and Termination" section of the Letter Agreement, it very carefully states that, "[t]he term of *this Letter* shall commence . . . and expire . . . ." Campling Decl. ¶ 5, Ex. C, ¶ 11 (emphasis added). Further down in that same section, moreover, there is the reference to a future definitive agreement superseding the Marketing Agreement. The omission of any reference to the term of the Marketing Agreement in the Letter Agreement establishes that only the Letter Agreement

---

[6] It is also in direct conflict with HEI's understanding of and intent with regard to the Letter Agreement.

would expire (if not renewed) on December 31, 2007. The Marketing Agreement survived until terminated in accordance with its terms.

Nowhere does the Letter Agreement state that HEI's right to service and administer the HEI Program would cease at the end of 2007. Nowhere does the Letter Agreement state that its terms are in consideration for AXP refraining from terminating the Marketing Agreement. Nowhere does the Letter Agreement state that the parties' relationship will terminate at the end of 2007. "The courts may not rewrite a term of a contract by 'interpretation' when it is clear and unambiguous on its face." *Fiore v. Fiore*, 46 N.Y.2d 971, 973, 389 N.E.2d 138, 139 (1979). AXP's unsupported and revisionist history of the Letter Agreement conflicts with its plain text, and the plain text will control.

**B.    The Rights of the Parties to Posses the Information AXP Seeks Are Governed by the Marketing Agreement, and the Marketing Agreement Places the Right of Possession in HEI.**

**1.    AXP Has No Right to Possess What it Does Not Own.**

The Parties' rights to possess the information AXP seeks are specified in and governed by the Marketing Agreement. As an initial proposition, AXP has no right to possess information or data that it does not own, absent an agreement to the contrary (which does not exist and is not alleged to exist). Of the information AXP has demanded, AXP fails to meet its burden in demonstrating that many of the items are owned by AXP. Accordingly, AXP has utterly failed to make a clear or substantial showing of a likelihood of success that it will ultimately earn the right to possess information it does not own, and thus its motion for preliminary injunction (and request for a writ of replevin) must be denied as to these items of information.

**2.    Ownership Does Not Equate to a Right of Possession, and Right of Possession Remains with HEI.**

Regarding the demanded information that AXP does own, AXP fails to distinguish between ownership and the right to possession.  It is the right to possession that governs AXP's claims.  "Replevin . . . not only requires possession, but an exclusive right to possess and control property."  *Brooklyn Ash Removal Co., Inc. v. Connell*, 173 A.D. 5, 6, 158 N.Y.S. 1034, 1035 (N.Y.A.D. 2 Dept. 1916)(citation omitted).   AXP may own some – but not all - of the information it seeks, but the right to possess and use that information remains with HEI while the Marketing Agreement is in force and while HEI has the right to service and administer the HEI Program.

The only reference in the AXP Memo to a contractual basis for AXP's right of possession (as opposed to the right of ultimate ownership) is the reference at pages 12 to 13, where AXP cites to the Transfer Assistance provision of the Marketing Agreement.  AXP Memo, at 12-13.  The Transfer Assistance provision does provide that HEI will, at AXP's request, provide certain information to AXP.  Blair Affidavit, ¶ 4, Ex. A, § 18(vi).  However, the Transfer Assistance provision only applies "*[u]pon the expiration or termination of this Agreement . . . .*"  *Id.*  If the Marketing Agreement has not terminated, and it has not, HEI is not obligated to provide the assistance and information to AXP.[7]

As an example of AXP's misuse of ownership as a substitute for possession, AXP refers to Exhibit G, Section 2 of the Marketing Agreement for the proposition that the database of Enrolled Customers shall remain the sole property of AMEX.  AXP Memo, at p. 10.  Ownership

---

[7] In 2006, AXP threatened to terminate the Marketing Agreement, but never did so.  *Id.* ¶ 7.  Those threats prompted HEI to begin discussions with AXP concerning what transfer assistance would entail if and when termination did occur.  *Id.* ¶ 12, Ex. G.  While those discussions were geared toward the future, HEI made clear that any transfer assistance in the future would be predicated upon the termination of the Marketing Agreement, which had not yet occurred.  [mott letter 7/20/07]("transfer assistance can only be requested by Amex upon the termination or expiration of the September, 1999 Marketing Agreement.").

to that information, however, is not the issue, and will not be determinative of AXP's claims. As for possession, Exhibit G further provides, under the heading "Return of Data," that "[u]pon request by AMEX *upon the termination or expiration of this Agreement*" HEI shall return or destroy such data. *Id.* ¶ 4, Ex. A, Exhibit G, § 2 (emphasis added). AXP may own that data, but HEI need not return it until the parties' contractual relationship has concluded.

Simply put, the party who administers and services the HEI Program needs to possess and use the information in question. The Marketing Agreement acknowledges that reality. AXP concedes this point by contending that it cannot properly service the HEI Program without the information. HEI is the party who needs the information to continue to service the Program until the Marketing Agreement is terminated. Because the Marketing Agreement has not terminated, AXP has no right to exclusive possession of the information it owns and AXP will not prevail on its declaratory judgment or replevin claims. *See* 12B Carmondy-Wait *New York Practice* 2d §82:35 (June 2007), and cases cited therein ("If the defendant's . . . retention is lawful as long as certain conditions or state exists or until a certain contingency happens, the plaintiff, to maintain the action [for replevin], must show the nonexistence of the condition or state the happening of the contingency.").

### 3.    AXP Cannot Establish an Exclusive Right of Possession.

Furthermore, with respect to AXP's replevin claim, AXP bears the burden of establishing not only an immediate and superior right of possession to HEI, but an <u>exclusive</u> right of possession. *See Brooklyn Ash*, 158 N.Y.S. at 1035. *See also* 12B Carmondy-Wait *New York Practice* 2d §82:35 (June 2007), and cases cited therein. AXP's alternative demand for an immediate writ of replevin (that is, prior to the determination on the merits) must fail if for no other reason that, for purposes of the remainder of this year, during which AXP acknowledges HEI has the right to service and administer the HEI Program, AXP's right of possession is not

exclusive of HEI's. HEI would be unable to fulfill its obligations, were that the case. Regarding the ultimate likelihood of success on the merits of its right to replevin this information, AXP will not succeed because the Marketing Agreement allows HEI to use the information and thus AXP's right of possession will never be exclusive until such time as the Agreement terminates.

## CONCLUSION

For all the foregoing reasons, AXP's motion for preliminary injunction, or alternatively, a writ of replevin should be denied in its entirety.

Dated: New York, New York
       August 15, 2007

<div style="margin-left:40%;">

CALINOFF & KATZ LLP

BY: _____

Robert A. Calinoff (RAC5743)
Attorneys for Defendant
HEALTHEXTRAS, INC.
140 East 45th Street
17th Floor
New York, New York 10017
(212) 826-8800

and

Miles & Stockbridge, P.C.
10 Light Street
Baltimore, Maryland 21202
(410) 727-6464

Of Counsel:
       Thomas E. Lynch, III
       E. Hutchinson Robbins, Jr.
       John R. Fischel

</div>

TO:

Louis Smith, Esq. (LS8851)
GREENBERG TRAURIG, LLP
Attorneys for Plaintiff
MetLife Building
200 Park Avenue
New York, New York  10166
(212) 801-9200

STATE OF NEW YORK      )

                             :ss

COUNTY OF NEW YORK   )


          Claudia E. Blanchard, being duly sworn, deposes and says:

          Deponent is not a party to the action, is over 18 years of age and resides in Queens, New York.

          On August 15, 2007, deponent personally served the within DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, A WRIT OF REPLEVIN upon:

Louis Smith, Esq.
GREENBERG TRAURIG, LLP
Attorneys for Plaintiff
MetLife Building
200 Park Avenue
New York, New York  10166


                                                    Claudia E. Blanchard

Sworn to before me this
15th day of August, 2007

         Notary Public

Jenna M. John
Notary Public, State of New York
No. 01JO6164720
Qualified in Kings County
Commission Expires Apr. 30, 20__