UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. <br><br> Plaintiff, <br><br> v. <br><br> HEALTHEXTRAS, INC. <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 07 CV 6986 - NRB |

**AFFIDAVIT OF DAVID T. BLAIR IN SUPPORT OF
DEFENDANT HEALTHEXTRAS' OPPOSITION TO
AMERICAN EXPRESS' MOTION FOR PRELIMINARY INJUNCTION**

I, David T. Blair, state under oath that I am over the age of eighteen and competent to make this Affidavit. I have personal knowledge with respect to the matters set forth below.

1.    I am the Chief Executive Officer with HealthExtras, Inc. (hereinafter "HealthExtras"), and have held that position since 1999. Prior to that I served as HealthExtras Chief Financial Officer. HealthExtras is a Delaware corporation with its principal place of business in Rockville, Maryland.

2.    Beginning in approximately 1997, HealthExtras conceived, designed and created a Supplemental Health and Disability Benefit Program (the "HEI Program" or the "Program"). It contracted with the late Christopher Reeve and his charitable foundation to endorse the HEI Program and to serve as its exclusive spokesperson. The development of the HEI Program was initially funded by private investment with additional capital raised at a later time through a public stock offering. The composition of the final product when marketing began in 1998 consisted of underwritten and non-underwritten benefits including an accidental permanent total

disability insurance coverage, an out-of-area emergency accident and sickness medical expense benefit, medical evacuation and a 24 hour nurse-on-call service. The insurance coverages are underwritten by highly rated insurance companies, as HealthExtras is neither an insurance company nor an insurance agent.

3.    Pricing to consumers for the HEI Program ranged from approximately ten dollars ($10.00) to fifteen dollars ($15.00) per month depending on the benefit level selected by the purchaser. Consumers who wish to purchase the benefits become members of the HEI Program. The HEI Program is marketed through financial institutions and other entities which enter into written agreements with HealthExtras, pursuant to which those entities are allowed to offer membership in the HEI Program. For example, HealthExtras enters into written agreements with various credit card issuers pursuant to which a credit card issuer is allowed to offer, or market, a particular HealthExtras program to its cardholders. HEI entered into precisely this type of contractual relationship with several large credit card issuing financial institutions (including CitiBank and Chase) prior to its agreement with the Plaintiff, American Express Travel Related Services Company, Inc. ("AXP").

4.    In late 1998, AXP approached HealthExtras asking to participate in the HEI Program. The parties subsequently entered into the September 17, 1999 Marketing Agreement pursuant to which HealthExtras made the HEI Program available to AXP cardholders. A true and correct copy of the Marketing Agreement is attached hereto ax **Exhibit A**. Under the Marketing Agreement, AXP's responsibility was to select the cardholder's to be solicited and to approve the use of AXP's name in the HealthExtras' marketing materials which AXP had requested to be private labeled or branded under its name. AXP negotiated a fee of 24% of gross revenues for making its cardmember base available for participation in the HEI Program.

HealthExtras is responsible for managing and administering all other aspects of the Program including payment of the insurers and other service providers and maintaining enrollee records. HealthExtras also provides monthly data files and reports to AXP on a number of categories of information including the status of enrollees, billing information, revenue reports, and customer service reports. These files and reports are provided in accordance with the terms of the parties' Marketing Agreement and in a mutually agreed upon format.

5.    HEI's marketing of the HEI Program to AXP's cardholders was successful. By April, 2002 the AXP enrollee population had reached 150,000 members. AXP was so pleased with the response that it inquired about opportunities to increase the revenues generated by the HEI Program. HealthExtras recommended that AXP assume the direct costs associated with future marketing campaigns, and in return HealthExtras agreed to increase AXP's fee under the revenue sharing formula to 50% of the membership fees earned from enrollees acquired after May 1, 2002. The relationship continued in a very positive manner.

6.    New mangers at AXP assumed responsibility for oversight of the HEI Program in mid-2004. Those new managers initiated a process to take ownership of the HEI Program and the associated revenue stream in a two-step process. The first step was to shift the underwriting responsibility from HealthExtras and the third-party insurer it contracted with to AXP's alleged affiliate, Amex Assurance Company. After acquiring control over the underwriting function, AXP planned to cancel the Marketing Agreement and then begin administering the HEI Program in order to capture the revenue stream for itself. AXP hid its intentions from HealthExtras until I confronted Ms. Aditi Gokhale, a vice president for AXP in a telephone conversation on April 11, 2006. During this telephone conversation, I also informed her that AXP had not satisfied the pre-conditions specified in the Marketing Agreement for changing the underwriter to its affiliate,

Amex Assurance Company.  A true and correct copy of my April 12, 2006 letter to Ms. Gokhale confirming our telephone conversation is attached hereto as **Exhibit B**.

7.    Though AXP threatened to terminate the Marketing Agreement as of the renewal date of September 17, 2006, it never did so.  Instead AXP agreed to HealthExtras' requests for executive negotiation pursuant to the alternative dispute resolution procedure required under section 20(e) of the Marketing Agreement.

8.    The parties subsequently met on May 2, 2006 and June 9, 2006, during which the parties discussed differences regarding AXP's right to: (i) terminate the Marketing Agreement; (ii) assume control over the HEI Program; and (iii) disregard the parties' revenue sharing formula.  No agreement was reached on these subjects.  Instead, the parties agreed, in principle, on a temporary 15 month agreement to: (i) permit AXP to change the underwriter to Amex Assurance; (ii) modify the revenue sharing formula for the 15 month period ;  (iii) agree to negotiate in good faith on a more Definitive Agreement regarding AXP's desire to acquire the revenue stream associated with the existing enrollee base acquired under the HEI Program using the Christopher Reeve endorsement; and (iv) allow AXP to use the HEI developed marketing materials in future marketing campaigns.  The Letter Agreement did not terminate the underlying Marketing Agreement, but rather specifically contemplated that a more Definitive Agreement would be needed to supersede the Marketing Agreement.  It did not provide for transfer of ownership of the HEI Program or the enrollees to AXP, and it did not change the parties' revenue sharing formula beyond December 31, 2007.

9.    After the Letter Agreement was signed, HealthExtras negotiated with in-house AXP managers to sign an agreement with Amex Assurance Company to be the substitute underwriter for the disability benefit as provided for under the Letter Agreement.  Negotiations

were ongoing for a more Definitive Agreement and/or a Transition Services Agreement when AXP made a demand for additional monies not provided for under the terms of the Letter Agreement. When HealthExtras refused to re-negotiate the compensation under the Letter Agreement, Amex ended all discussions and referred the matter to its outside counsel, Louis Smith of the law firm of Greenberg Traurig, LLP.

10.    From October, 2006 until May, 2007 Amex refused to discuss terms of a more Definitive Agreement or a Transition Services Agreement until the dispute over additional compensation under the Letter Agreement was resolved. During this time HealthExtras continued to provide all ongoing support for the HEI Program.

11.    Beginning in February, 2007, AXP began requesting information to allow AXP to assume operational control of the HEI Program sometime during the 2007 calendar year. HealthExtras responded that the parties first needed to resolve the Letter Agreement compensation dispute as well as engage in further negotiations to produce a Definitive Agreement. True and correct copies of my letter dated May 29, 2007 to Ms. Naeemah Ruffin, is attached hereto as **Exhibit C**. As evidenced in the attached letters, HealthExtras attempted to move the process forward by requesting direct negotiations with the AXP principals as required by the Marketing Agreement rather than continuing to negotiate indirectly through the parties' attorneys.

12.    AXP declined HealthExtras' request for an executive meeting under the alternative dispute resolution clause of the Marketing Agreement through its attorney, Louis Smith, Esquire. A copy of a letter dated June 15, 2007 from Louis Smith, Esquire to Joseph M. Mott, Esquire is attached hereto as **Exhibit D**. In the June 15, letter, Mr. Smith (on behalf of AXP) also withdrew AXP's request to take early control over the HEI Program and specifically

5

referenced the need for further documentation. HealthExtras responded six days later enclosing a proposed Transition Services Agreement. A true and correct copy of a letter dated June 21, 2007 from Joseph M. Mott, Esquire to Louis Smith, Esquire is attached hereto as **Exhibit E**. Mr. Mott did not hear back from Mr. Smith until receipt of his letter dated July 6, 2007 demanding information under paragraph 18 of the Marketing Agreement and advising that AXP was refusing to negotiate or execute any further agreements. A true and correct copy of a letter dated July 6, 2007 from Louis Smith, Esquire to Joseph M. Mott, Esquire is attached hereto as **Exhibit F**. Mr. Mott responded to Mr. Smith requesting clarification regarding which of the termination options AXP was electing under the Marketing Agreement, and once again requesting a meeting of executives required under the alternative dispute resolution procedure of the Marketing Agreement. A true and correct copy of a letter dated July 20, 2007 from Joseph M. Mott, Esquire to Louis Smith. Esquire is attached hereto as **Exhibit G**. Mr. Smith did not respond to Mr. Mott's July 20 letter and instead filed this lawsuit on behalf of AXP.

13.    After this lawsuit was filed, Mr. Mott again sent Mr. Smith a demand to comply with the alternative dispute resolution procedure required by the Marketing Agreement as a pre-condition to filing a court action, which Mr. Smith promptly rejected without specifying any reason for rejecting the demand. True and correct copies of a letter dated August 7, 2007 from Joseph M. Mott, Esquire to Louis Smith, Esquire and a letter from Louis Smith, Esquire to Joseph M. Mott, Esquire dated August 8, 2007 are collectively attached hereto as **Exhibit H**.

Pursuant to 28 U.S.C. §1746, I swear under penalty of perjury that the testimony set forth herein is true and correct.

Executed on August 13 , 2007.

DAVID T. BLAIR

STATE OF MARYLAND            )
                             )      ss.
COUNTY OF MONTGOMERY         )

Subscribed and sworn before me this ___13th___ day of August, 2007.

Notary Public, State of Maryland
My Commission Expires _08/02/2010_

ELIZABETH A. VON DREHLE
Notary Public-Maryland
Montgomery County
My Commission Expires
August 02, 2010

7