**Exhibit A**

Case 1:07-cv-06986-NRB    Document 13-2    Filed 10/10/2007    Page 1 of 10

# MARKETING AGREEMENT

This Marketing Agreement (this "Agreement") is entered into this 17th day of September, 1999, by HEALTHEXTRAS, LLC., a Delaware corporation ("HEALTHEXTRAS") with offices at 2275 Research Blvd., Rockville, MD 20850 and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., a New York corporation ("AMEX") with offices at 200 Vesey Street, New York, NY 10285.

WHEREAS, HEALTHEXTRAS together with its wholly-owned affiliates, subsidiaries and service contract entities are engaged in, among other things, the business of promoting, selling and providing to consumers programs associated with disability and travel medical care insurance and non-underwritten program benefits, (as more specifically described herein, the "Accidental Disability Plan"); and

WHEREAS, AMEX desires to have offered, and to participate under the terms and conditions of this Agreement with HEALTHEXTRAS in the offering of such Accidental Disability Plan, to (i) certain of AMEX's current and future holders of a charge, credit, debit, stored value or smart card issued by or on behalf of AMEX, its affiliates or licensees each such holder herein, a "Cardmember", each such card herein, an "American Express Card" or "Card"; and (ii) any other customers of American Express who are not Cardmembers. Such customers together with Cardmembers shall be referred to herein as "Customer(s)."

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the parties hereto agree as follows:

1. **THE AMEX SERVICE:**

    (a) As used herein:

    - the "Accidental Disability Plan" or "Plan" shall mean the insurance service to be branded under the name "American Express Accidental Disability Plan" offered by HEALTHEXTRAS to Customers in accordance with the terms hereof, which includes the Unique AMEX Benefit(s) as more particularly described in Exhibit A hereto; and

    - the "Unique AMEX Benefit(s)" shall mean each feature and/or enhancement developed by i) AMEX; or ii) AMEX and HEALTHEXTRAS jointly; or iii) by HEALTHEXTRAS specifically for AMEX at its request, in accordance with the terms hereof for inclusion exclusively with the offering of the Accidental Disability Plan to Customers.

    (b) In accordance with the terms and conditions set forth herein, AMEX hereby retains HEALTHEXTRAS, and HEALTHEXTRAS hereby agrees, to provide the Accidental Disability Plan to Customers. The parties will be compensated for their services in accordance with Section 3.

    (c) HEALTHEXTRAS shall use its reasonable best efforts to develop, and assist AMEX in the development of the Unique AMEX Benefits(s) from time to time during the term of this Agreement. Such Unique AMEX Benefits(s) shall be designed to enhance and materially

(a)  #143704 v04, page 1 of 45

Exhibit A

differentiate the Accidental Disability Plan from other programs that HEALTHEXTRAS offers.

(d) The Accidental Disability Plan with the Unique AMEX Benefit shall be provided exclusively to Customers unless agreed in writing by AMEX. In the marketing and promotion of the Accidental Disability Plan to Customers, including without limitation segments thereof, AMEX shall determine in its sole discretion which Unique AMEX Benefit(s) and Plan features shall be included in the Accidental Disability Plan as so marketed and promoted.

(e) In the event AMEX decides to have created, developed and maintained a website ("Website"), HEALTHEXTRAS with AMEX's consent shall create, develop and maintain the Website exclusively for the American Express Accidental Disability Plan, until AMEX decides in its sole discretion to discontinue the Website. At the Website, Customers may obtain more information about the American Express Accidental Disability Plan and may enroll in the Plan. AMEX shall have the exclusive right to approve the design and content of such Website and HEALTHEXTRAS shall obtain written approval from AMEX prior to releasing the Website to the Internet. In the event that AMEX elects to direct Customers to the Website through affiliated links, statement messaging, e-mail marketing or through other channels as AMEX may request, HEALTHEXTRAS will, upon mutual agreement, pay the expenses of directing such Customers to the Website.

## 2. NOTIFICATION OF COMPLAINTS BY CUSTOMERS:

With respect to any such complaint that concerns or is made by Customers, HEALTHEXTRAS shall notify AMEX by facsimile at the numbers indicated in section 15 hereof, immediately upon receipt of such complaint and no later than one business day after receipt of such complaint and inform AMEX of the substance of the complaint (in as much detail as is known) and the name of the Customer and all identifying information including, but not limited to the Customer's Card account number (if applicable) and nature of complaint.



## 3. FINANCIAL TERMS:

(a) These terms will apply for the two(2) year initial term of this Agreement, commencing with the commencement of the pilot. For the purposes of this Agreement, Customers who enroll in the Plan are "Enrollee(s)" and the fees Customers pay for the Plan are "Enrollment Fee(s)".

   (1) The Plan will launch at a $9.95 Enrollment Fee for the $1.5 million dollar lump-sum benefits or for the annuity payment of $2.3 million as described in Exhibit A..
   (2) AMEX can raise the Enrollment fee in accordance with applicable regulations, at any time, subject to regulatory approval if required.
   (3) HEALTHEXTRAS can adjust Enrollment Fee levels in accordance with Exhibit A, only if upon providing in advance and in writing reasonable proof that the economics of the plan have changed.
   (4) Enrollment Fees for Cardmember Enrollees will be billed to the Cardmembers' American Express Card account. AMEX shall be responsible for billing and collecting all

Enrollment Fees for Cardmember Enrollees. Billing procedures for Customers who are not Cardmembers will be mutually agreed upon between the parties.

(5) In consideration of AMEX's assistance, support, limited list access and services hereunder, AMEX will receive 22% of single enrollment gross Plan revenues and 24% of dual enrollment gross Plan revenues less pro rata refunds during the initial term of this Agreement. This percentage will increase to 24% of all gross Plan revenues less pro rata refunds when the total number of Enrollees reaches 100,000(the "Net Enrollees") during the initial term or upon renewal of this contract whichever comes first.

(6) HEALTHEXTRAS will have two (2) Service Establishment accounts ("S/E Accounts") with AMEX for collection of the single and dual gross revenue Plan fee, as described herein. AMEX will set up the two S/E Accounts for the purposes of billing Enrollment Fees. HEALTHEXTRAS is responsible for insuring that gross enrollment Plan revenues are applied to the proper S/E Accounts. AMEX shall deduct its payment from the Enrollment Fees billed and paid through HEALTHEXTRAS' S/E accounts, and will forward to HEALTHEXTRAS the difference.

(7) Plan revenue will be defined as gross revenue received from the end-consumer. This revenue will not be net of any administrative fees.

(8) HEALTHEXTRAS will pay all marketing costs for the Plan.

(9) If the average acquisition cost of new Enrollees is less than $40 per new Enrollee, HEALTHEXTRAS and AMEX will share the difference between the actual acquisition cost and $40. The difference will be split 50% to AMEX and 50% to HEALTHEXTRAS.

(10) If the disability insurance fee (payable by HEALTHEXTRAS to the insurance underwriter for the Plan as set forth in Exhibit C hereto) per Enrollee is less than $27 per million dollars of coverage, HEALTHEXTRAS and AMEX will split the difference 50% to AMEX and 50% to HEALTHEXTRAS.

4. **PROMOTION OF THE PLAN:** AMEX shall promote the Accidental Disability Plan to Customers by participating in Promotional Programs (as defined below) in the manner and to the extent provided for in this Agreement. During the term of this Agreement AMEX may engage in other solicitation activities relating to the Accidental Disability Plan including both channel promotions and specific materials with the approval of HEALTHEXTRAS which approval will not be unreasonably withheld.

(a) <u>Promotional Programs</u>: The parties acknowledge that they intend to offer the Accidental Disability Plan through various campaigns, promotional programs and channels (including without limitation, direct mail, telemarketing, and internet promotions)as determined by AMEX ("PromotionalPrograms"). All marketing and other promotional materials (including, without limitation, solicitation, fulfillment, information request packets, telemarketing scripts, customer service and retention materials) developed hereunder in connection with any Promotional Program for the Accidental Disability Plan shall be referred to as "Promotional Materials". AMEX must approve all Promotional Materials, and in the event of a disagreement, AMEX shall have the final controlling rights on all marketing and promotion of the Accidental Disability Plan (including but not limited to presentation, copy, format, design, script development, etc.), so long as such marketing and promotion do not violate any contracts, laws or regulations. Solely, AMEX will approve the timing and scope of all marketing activities hereunder (i.e., size and frequency of solicitations). 

(a)  #143704 v04, page 3 of 45

(b) <u>Promotional Materials and channels:</u> HEALTHEXTRAS shall prepare, at HEALTHEXTRAS' expense, Promotional Materials for all services offered pursuant to this Agreement. Such materials shall be designed to solicit Customers to subscribe to the Accidental Disability Plan and become Enrollees. HEALTHEXTRAS shall arrange for and implement, at its expense, all marketing channels, including direct mail solicitation and fulfillment, internet web sites and advertising, telemarketing, media costs, etc. All channels used to promote the Plan will be mutually agreed in advance and in writing with AMEX.

(c) <u>Ownership of Customer Lists:</u> AMEX shall have all rights and interests to the list of Enrollees and the information contained thereon. HEALTHEXTRAS (1) shall not solicit directly or indirectly Customers or Enrollees for any reason other than in accordance with the terms of this Agreement or as requested in writing by AMEX; and (2) may neither communicate with, nor permit any other persons or entities, including its vendors, agents, representatives, licensees or designees, to communicate with Enrollees without the prior written consent of AMEX. Notwithstanding the foregoing, HEALTHEXTRAS may market product and services to its own customers and potential customers provided that (A) in any such marketing, such customer is not identified in any manner as an AMEX Customer or holder of an American Express Card; and (B) the source of the information used by HEALTHEXTRAS to target such customer or potential customer is neither an Enrollee list, an AMEX Customer list, nor from any of the lists provided by or on behalf of AMEX under this Agreement. HEALTHEXTRAS further represents and warrants that its undertakings hereunder do not interfere with any other contractual obligation of HEALTHEXTRAS to any third party. The terms of this Section 4(c) shall survive the termination of this Agreement.

(d) <u>Preparing Files and Conducting Promotional Programs:</u>

  (1) HEALTHEXTRAS may provide AMEX with information on the type of segmentation HEALTHEXTRAS seeks, but AMEX will make final selection of AMEX Customer names and segments.

  (2) HEALTHEXTRAS will not be given nor seek direct access to any information contained or originating from either an AMEX tape or database containing AMEX Customer data (the "Files"). All Promotional Programs to selected Customers will be either mailed by an approved fulfillment house, or otherwise distributed through marketing channels as mutually agreed to by the parties.

(e) <u>Use of Files/Fees</u>

  (1) HEALTHEXTRAS represents and warrants that to promote its Accidental Disability Plan it is authorized to participate in joint Promotional Programs with AMEX, and that such participation does not interfere with any other contractual obligations of HEALTHEXTRAS or any third party.

  (2) In order to comply with its obligations under this Section, and for no other purpose, HEALTHEXTRAS may code its own customer list ("House List") in a way to identify Enrollees.

(3) Except as otherwise necessary to comply with this Agreement, HEALTHEXTRAS may not permanently enhance its own House Lists or files by using names, addresses, account numbers, social security numbers or other information, whether specified or implied, obtained from the File or from its obligations in processing Enrollees. Prohibited enhancements include, but are not limited to HEALTHEXTRAS:

(i) Adding codes to House Lists indicating that the individual is an AMEX Cardmember and/or Customer;
(ii) Adding or upgrading zipcode information of House Lists;
(iii) Adding first names or initial to House Lists;
(iv) Adding middle initials, suffix or prefix information to House Lists;
(v) Adding amended telephone numbers, business numbers, fax numbers or email addresses;
(vi) Expanding House Lists with the names and addresses or company names of Customers.

Upon the expiration or termination of this Agreement, HEALTHEXTRAS shall immediately eliminate from its House Lists all confidential information extracted from the File and/or belonging to AMEX.

(4) AMEX hereby agrees to permit use of the Files solely for the purpose of AMEX' and HEALTHEXTRAS marketing of the Plan as set forth herein, subject to the following terms and conditions.

(i) The Files will remain at all times the sole property of AMEX.
(ii) HEALTHEXTRAS understands and agrees that information furnished through the File shall be considered confidential and trade secret of AMEX, shall not be communicated to its employees except on a "need to know" basis, and shall not be used for competitive purposes or disclosed to third parties by HEALTHEXTRAS.
(iii) HEALTHEXTRAS agrees that if there is any disclosure of such information by its employees, it will enforce for AMEX' benefit through litigation, if necessary, all rights provided under law to compensate AMEX for any damages arising out of such disclosure. HEALTHEXTRAS further agrees that (a) any printed material used to verify the accuracy of the File will be shredded or otherwise destroyed; and (b) the tapes on which the File is contained or transmitted will be returned to AMEX and will not be maintained in original form or duplicate form by HEALTHEXTRAS.
(iv) HEALTHEXTRAS may not use the File for any purpose other than the Promotional Program(s) for which the File was supplied, and any File may be used only once.
(v) HEALTHEXTRAS will not duplicate the File, or any portion thereof, in any manner whatsoever, nor permit any parent, subsidiary, affiliate, third party, agent, employee or contractor, or their respective agents to do so.
(vi) HEALTHEXTRAS may not revise the data contained in the File for any

      purpose without prior written permission from AMEX.
- (vii) AMEX may monitor the File in any manner to prevent the improper or unauthorized use of the File and such monitoring may include, but is not limited to, on-site inspection of any facility which maintains all or any portion of the File, and planted and/or varied names, addresses, telephone numbers and email addresses.
- (viii) HEALTHEXTRAS may not use any method to delete, alter or eliminate planted names.

**5. PERFORMANCE STANDARDS:** HEALTHEXTRAS shall fulfill the requirements set forth in the following exhibits attached hereto and made a part hereof:

    Exhibit A: Description of the AMEX service and the Unique AMEX Benefits

    Exhibit B: Description of Services and Coverage

    Exhibit C: Pricing, Underwriting, and Marketing

    Exhibit D: Quality Standards

The requirements set forth in the foregoing exhibits shall be deemed the performance standards (the "Performance Standards") hereunder. The parties hereto agree and acknowledge that the failure of HEALTHEXTRAS to fulfill the requirements of the Performance Standards shall constitute a material breach of this Agreement.

**6. USE OF APPROVED VENDORS -**
- (a) AMEX agrees that HEALTHEXTRAS may perform some of its obligations hereunder, through the use of Approved Vendors, provided such vendors have been approved in advance and in writing by AMEX and further provided that HEALTHEXTRAS remains at all times liable and responsible for the performance of such Approved Vendors. The Approved Vendors listed in Exhibit L attached hereto are hereby deemed approved by AMEX. No change in the attached list of Approved Vendors may be made without AMEX' prior written consent. AMEX may, with good cause shown, request that HEALTHEXTRAS replace any Approved Vendor on the attached list with another vendor provided the replacement vendor can provide the same level and quality of service at comparable or at less of a cost, and HEALTHEXTRAS shall not unreasonably refuse such request.
- (b) Among the Approved Vendors listed on Exhibit L is the Underwriter and claims adjustor for the disability benefits portion of the Accidental Disability Plan, Reliance National Insurance Company ("RELIANCE"), the Underwriter and claims adjustor for the travel medical benefits portion of the Accidental Disability Plan, Fidelity Security Life Insurance Company ("FIDELITY"), and the vendor for the medical transport service portion of the Accidental Disability Plan, On Call International ("OCI"). Attached as Exhibit M are true and accurate copies of the policies and service contracts applicable to the Accidental Disability Plan.

**7. CUSTOMER SERVICE REPORTS:**

HEALTHEXTRAS shall provide AMEX with the following reports, at the time and in the form and substance mutually agreed upon by the parties hereto.

(a) Customer report summarizing beginning enrollees, new enrollees, total attritors, and total ending enrollees on a monthly and year to date basis. The report required under this section shall be provided on a weekly basis for the first six (6) months of the Accidental Disability Plan. Thereafter it shall be provided on a monthly basis. The other reports described below will be provided to AMEX on a monthly basis or as otherwise reasonably requested by AMEX.

(b) Customer report on a monthly and year-to-date basis that includes the following: (A) test cell code, (B) date of enrollment, (C) name and address of Enrollee, (D) Enrollees' Card Account number and expiration date, (E) age of Enrollee, (F) type of plan purchased (i.e., individual, dual), (G) amount of insurance benefit purchased, (H) total number of enrollments, (I) percentage of total enrollments by plan type, (J) percentage of total enrollments by amount of insurance benefit purchased.

(c) Revenue report on a monthly and year-to-date basis setting forth: (A) test cell code, (B) type of plan purchased by Enrollee (i.e., individual, dual), (C) amount of insurance benefit purchased by Enrollee, (D) gross revenue (retail price) billed to Enrollees' Card Account, (E) refunds credited to Enrollees' Card Account due to enrollee cancellations.

(d) Customer service report including: (A) number of Customers contacting Customer service, (B) wait/response time for telephone, (C) length of telephone calls; and (D) reason for contacting customer service.

(e) Attrition report including: (A) attrition rate by test cell code by month, (B) total number of the Enrollees that cancel their enrollment in the Accidental Disability Plan; (C) reasons disclosed to HEALTHEXTRAS for such Customers' discontinuing their respective enrollment; (D) date of cancellation by such Enrollees; and (E) dates such Enrollees use the Accidental Disability Plan.

(f) Claim report grouped by individual certificate holder including: (A) paid and open claims including date of loss, detailed description of claim, paid and open reserves, sums recovered from primary insurer by subrogation, and loss adjustment expenses, (B) claims that have been denied including date of loss, a detailed description of claim, reason for denial and amount claimed; and (c) a report recapping in detail the year to date loss ratio, for the Accidental Disability Plan (paid plus open claims, including loss adjustment expenses divided by gross premium paid plus outstanding).

8. **EXCLUSIVITY:**

During the term of this Agreement, neither HEALTHEXTRAS nor any affiliate thereof may market any service or program similar to the Accidental Disability Plan which includes the Unique AMEX Benefits to any entity. HEALTHEXTRAS hereby represents and warrants and covenants to AMEX that HEALTHEXTRAS is under no obligation to offer or provide a service including the Unique AMEX Benefits under any other agreement to any entity.

9. **INDEMNIFICATION; LIMITATION OF LIABILITY:**

   (a) HEALTHEXTRAS shall protect, defend, indemnify and hold harmless AMEX, its parent, subsidiaries, affiliates successors, assignees, directors, officers, agents and employees (each an "Indemnitee") from and against any loss, damage, cost, expense, liability, and settlement, including without limitation, any reasonable attorney fees and court costs (each of the foregoing a "Claim") reasonably incurred by any Indemnitee which Claim arises out of or in connection with, either directly or indirectly, (i) the performance of HEALTHEXTRAS or its officers, directors, employees, Approved Vendors, contractors or agents (collectively, the "Agents") of the duties and obligations under this Agreement; (ii) the failure of HEALTHEXTRAS or its Agents, as the case may be, to comply with the terms of this Agreement; or (iii) the failure of HEALTHEXTRAS (including without limitation its Agents who perform on behalf of HEALTHEXTRAS hereunder) to comply with its obligations under any and all laws, rules, or regulations applicable to HEALTHEXTRAS, its Agents or the Accidental Disability Plan, as the case may be; or (iv) the Accidental Disability Plan.

   (b) AMEX shall protect, defend, indemnify and hold harmless HEALTHEXTRAS and its affiliates and their officers, directors, employees, agents and representatives ("Indemnified Persons") from and against any and all liabilities, obligations, losses, costs, expenses, fines, penalties, claims, demands, actions, proceedings, damages and suits, including without limitation reasonable attorney's fees and expenses suffered or incurred by or alleged or asserted against any Indemnified Person arising out of AMEX's breach of any of its obligations, responsibilities, warranties or representations under this Agreement.

   (c) Each Indemnitee, seeking indemnification under this Agreement, shall give prompt notice to HEALTHEXTRAS, along with such Indemnitee's request for indemnification, of any Claim for which it is seeking indemnification. The parties understand and further agree that no settlement of an indemnified Claim shall be made by an Indemnitee without the concurrence of HEALTHEXTRAS who shall control the settlement or defense of any Claim; provided, however, that the Indemnitee may, at its cost, engage its own attorneys. The Indemnitee will fully cooperate with HEALTHEXTRAS to enable it to fulfill its obligations with respect to such Claim. The provisions of this Section 8 shall survive the termination of this Agreement.

   (d) In no event shall any party hereto (including without limitation the agents and employees thereof) be liable to the other party (including without limitation the agents and employees thereof) for any special, incidental or consequential damages, even if such party shall have been advised of the possibility of such potential loss or damage.

   (e) Except as specifically provided herein, the parties hereto expressly agree and acknowledge that the cumulative damages payable by one party hereto (the "liable party") to the other during any one year shall be limited to the maximum amount of $5,000,000.00. Such limitation shall not apply to the indemnity applicable to third party claims that may arise out of the Accidental Disability Plan.

10. **PUBLICITY**: Except as may be required by law, no party hereto shall issue advertising, promotional activity, press or publicity release relating to the AMEX Service or this Agreement or the other party without securing the prior written consent of such other party.

11. **CONFIDENTIALITY**:

(a) HEALTHEXTRAS and AMEX acknowledge that as a result of the performance of their respective responsibilities under this Agreement, AMEX will obtain access to confidential and proprietary information of HEALTHEXTRAS and HEALTHEXTRAS will obtain access to confidential and proprietary information concerning Cardmembers, AMEX' business, customers, methodologies and strategies (all such information herein the "Confidential Information"). All such Confidential Information of the other party shall be deemed to be confidential and proprietary unless such Confidential Information: (i) is clearly intended for public distribution by AMEX, in the case of AMEX Confidential Information, or by HEALTHEXTRAS, in the case of HEALTHEXTRAS' Confidential Information; (ii) is known by the receiving party prior to its receipt thereof; (iii) is lawfully obtained by the receiving party from a third party; or (iv) is independently developed by the receiving party without use of any portion of such Confidential Information which can be reasonably demonstrated by written record.

(b) This Agreement, including the terms and exclusivity of the Unique AMEX Benefits, along with all exhibits hereto, is hereby designated as confidential within the meaning of this Section 11 and shall not be disclosed to a third party.

(c) HEALTHEXTRAS and AMEX shall not use any of the other party's Confidential Information for any purpose other than to perform their respective responsibilities under this Agreement. HEALHEXTRAS and AMEX shall each take the same measures to protect the Confidential Information of the other party received by it as it prudentially should take with respect to its own Confidential Information, including, but not limited to, instructing its employees, Approved Vendors, and agents, of the foregoing and requiring them to be bound by appropriate confidentiality agreements.

(d) It is understood and agreed by the parties hereto that all files of Enrollees (including, but not limited to, the master file tape for the Accidental Disability Plan) are and always have been the exclusive property of AMEX, and will be turned over to AMEX, at no cost to AMEX, upon termination of this Agreement.

(e) Nothing in this Agreement shall be deemed to prevent HEALTHEXTRAS or AMEX from providing information to their respective agents, representatives and Approved Vendors who are retained to assist in the performance of such party's obligations hereunder provided that the conditions set forth herein are complied with by such party and its agents, representatives or Approved Vendors. In addition, HEALTHEXTRAS agrees that none of its agents, representatives or Approved Vendors granted access to such information is a competitor of AMEX.

(f) Each party acknowledges that irreparable injury would be caused to the other party in the event of unauthorized use of such other party's Confidential Information, and agrees that preliminary and permanent injunctive relief would be appropriate in the event of breach of