Exhibit B



Health Extras, Inc.
800 King Farm Boulevard
Rockville, MD 20850
Telephone: 301.548.2900
Facsimile: 240.268.3120

April 12, 2006

Ms. Aditi J. Gokhale
Vice President Fee Services
American Express Cards
200 Vesey Street
New York, N.Y. 10285

Re:  Accidental Disability Plan

Dear Aditi:

As we discussed, I am providing you this letter as a follow-up to our recent discussions regarding your intention to change underwriters for the HealthExtras' Accidental Disability Plan (a/k/a the Accident Protection Plan) and to terminate our Marketing Agreement. First let me reiterate that HealthExtras recognizes American Express Travel Related Services Company, Inc. ("Amex") right to change the underwriter as specified in the contract and we are committed to meeting your business objectives within the time frames you have expressed.

Based on our understanding of Amex's objectives and a review of our current agreements it is clear that executing a new agreement has to be our first priority. There are multiple obligations under several of our existing agreements that have to be satisfied before we can move forward.

For example, in Exhibit C, section 2 it states that: "If Amex elects to change the underwriter, Amex shall provide HealthExtras with copies of State policy filings and necessary Department of Insurance approvals". There are 49 states where the program is currently underwritten and to date we have not received copies of any of the actual policy filings or approvals. Section 1(C) of Exhibit C also requires that the proposed new underwriter, Amex Assurance, accept "the same amount" as the underwriter being replaced, which monies shall be remitted by HealthExtras. Amex has proposed changing this process upon transitioning the underwriting responsibility to Amex Assurance. Clearly, these and other matters need to be agreed upon. At that time, HealthExtras will be pleased to consent to a change in underwriters as required under Exhibit C, section 1(B) of our Marketing Agreement.

The second item we discussed was Amex's intention to terminate the Marketing Agreement this upcoming September and your interpretation of HealthExtras' rights following termination. In particular, we discussed section 18(b)(ii). While we recognize Amex's right to terminate the Marketing Agreement, HealthExtras is entitled to a two-year run out under the existing terms and conditions. As I expressed, HealthExtras has not merely operated as a fulfillment and

**Exhibit B**

American Express Company
April 12, 2006
Page 2

customer service vendor under the Marketing Agreement. Rather, HealthExtras conceptualized, developed and brought its Accidental Disability Program to Amex, including the Reeve endorsement, paid for the marketing costs to acquire the majority of enrolled members, and provided customer service and fulfillment services.

The two-year run out called for under section 18(b)(ii) was agreed to by the parties for various reasons, including as compensation to HealthExtras for the development costs incurred, to recoup its marketing expenses and as a means to allow Amex to continue to utilize HealthExtras' intellectual property in the event Amex elected to terminate the Marketing Agreement, but yet continue to offer an Accidental Disability Plan after termination.

We understand that Amex interprets the language within section 18(b)(ii) to only apply to "Early Termination." Amex appears to rely on the heading for section 18(b) to justify this position. However, that position is undercut by section 20(a) which reads "Headings stated in this Agreement are for convenience of reference only and are not intended as a summary of such sections and do not affect, limit, modify, or construe the contents thereof." The two-year run out is also consistent with the multi-year run out that Amex agreed to with National Union Fire Insurance Company of Pittsburgh, PA (NUFIC) and HealthExtras in the Three Party Marketing Agreement dated January 1, 2005. Suffice it to say, this is an issue that needs to be addressed before we proceed further.

Another important and sensitive obligation is the Christopher Reeve endorsement. HealthExtras and Christopher Reeve worked together to develop the Accidental Disability program. The Reeve estate continues to lend its name and support to the program and receives ongoing compensation linked directly to the Amex enrollees (85% of the current Amex enrollees were acquired utilizing either Chris' or Dana's endorsement). A decision by Amex to not honor the two-year run out would impact the payments to the Reeve heirs. Based on my dealings with the Reeve representatives, that decision will not be well received by them particularly in light of the recent deaths of both Christopher and Dana Reeve.

Aditi, we are committed to working with you to achieve your objectives and hope that Amex recognizes the issues which need to be addressed and finalized before the underwriter migration project can move forward. Please be assured that we will also continue to provide first-class service to Amex and its enrollees and are hopeful we can reach an agreement that satisfies the needs of both parties. HealthExtras values its long-standing relationship with Amex, and we look forward to your response.

Sincerely,

David T. Blair
Chief Executive Officer

DTB/ajc