UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.,

       Plaintiff,

v.

HEALTHEXTRAS, INC.,

       Defendant.

CIVIL ACTION NO. 07 cv 6986 (NRB)

---

**DECLARATION OF JULIE E. CAMPLING IN REPLY TO OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, OR
ALTERNATIVELY, A WRIT OF REPLEVIN**

---

JULIE E. CAMPLING hereby declares as follows:

    1.    I am currently a Director with the Purchasing Services Group of American Express Travel Related Services Company, Inc. ("AXP"). I previously had responsibilities relating to the relationship between AXP and HealthExtras, Inc. ("HealthExtras"). As such I have personal knowledge of the facts set forth herein.

    2.    Personnel from AXP and HealthExtras met on May 2, 2006, and June 9, 2006. I attended both of those meetings. David Blair of HealthExtras did not attend the meeting on June 9. Joseph M. Mott, in-house counsel for HealthExtras, did attend the June 9, 2006, meeting, which was the principal meeting that addressed the terms of what became the letter agreement between AXP, Amex Assurance Company, and HealthExtras dated June 23, 2006 (the "Letter Agreement"). A true and correct copy of a letter from

Mr. Mott dated May 16, 2006, which, among other things, addresses what was discussed at the May 2, meeting, is attached hereto as Exhibit A.

3.    Part Two (titled "Nonbinding Provisions") of Section B ("Further Definitive Agreement") of the Letter Agreement provides that "[e]xcept for changes or modifications to the Binding Provisions of the Letter, AMEX and HEI shall negotiate in good faith to arrive at a mutually acceptable Definitive Agreement for approval, execution and delivery on the earliest reasonably practicable date."

4.    Accordingly, on June 30, 2006, I forwarded to Mr. Mott a draft Master Services Agreement ("MSA"). After Mr. Mott failed to respond, I followed up on July 6, 2006, and again on July 21, 2006. A true and correct copy of an e-mail string containing the following e-mails is attached as Exhibit B: August 9, 2006, e-mail from Mr. Mott to me; August 4, 2006, e-mail from me to Mr. Mott; July 21, 2006, e-mail from Mr. Mott to me; July 21, 2006, e-mail from me to Mr. Mott.

5.    In his July 21, 2006, e-mail in response to mine sent earlier that day, Mr. Mott wrote in part as follows:

> More to the point, why do we need to go through the exercise of negotiating the new MSA when AMEX has clearly told us that it intends to terminate the relationship on December 31, 2007. I'm not certain why you and the other Amex team members are concerned. I was under the impression that everything was operating smoothly since the time we executed the Letter Agreement.
>
> If I'm mistaken, and you are looking to enter into a long-term relationship beginning January 1, 2008, then the MSA and schedule would make sense. And, I would certainly work diligently with you to finalize such an agreement. I would be happy to have you tell me you want a new agreement to take effect when the current one expires.

6.     As reflected in my responding August 4, 2006, e-mail, as a result of the response from Mr. Mott, AXP agreed to dispense with efforts to put in place a new MSA.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 17, 2007.

_____
JULIE E. CAMPLING

# Exhibit A

MAY-18-2006 THU 11:00 AM AMERIPRISE FINANCIAL        FAX NO. 6126713767              P. 02



Health Extras, Inc.
800 King Farm Boulevard
Rockville, MD 20850
Telephone: 301.548.2900
Facsimile: 240.268.3120

May 16, 2006

Ms. Naeemah Ruffin
Vice President &
    General Manager of Card Services, CCSG        **VIA OVERNIGHT DELIVERY**
American Express Travel Related
    Services Company, Inc.
200 Vesey Street                                **CONFIDENTIAL COMMUNICATION**
New York, NY 10285                              **FOR SETTLEMENT PURPOSES ONLY**

Mr. Paul Johnston
Vice President & Group Counsel
Mailstop H27-5229
50605 Amp Financial Center
Minneapolis, MN 55474

Re: Legal Issues Associated with the Marketing Agreement

Dear Naeemah and Paul:

At our meeting on May 2, 2006 in New York, we devoted the majority of the discussion to operational issues, the background of the Accidental Disability Program and how our past negotiations concerning business terms have been handled. We only briefly touched on the legal issues involving the contract and AMEX's proposed termination of our business relationship. At the conclusion of the meeting I suggested to Paul that it might be helpful to provide HealthExtras' position in writing to the two of you on the legal questions raised during the meeting with the hope that it would facilitate the negotiations at our next meeting. The purpose is not to persuade you of the correctness of our position, but to demonstrate that there is substantial room for disagreement concerning the interpretation of the contract.

During the last meeting, there were two principal reasons given as to why AMEX believes it is justified in terminating the contract without further payment to HealthExtras. Those two reasons were the termination clause under §18(b)(ii) of the Agreement, and the more general assertion that "AMEX owns the Enrollees." Taking the issues in order, let me begin with why HealthExtras thinks AMEX's reliance on 18(b)(ii) is flawed.

Section 18 reads in relevant part:

> (b) *Early Termination:* *In accordance with the following, this Agreement may be terminated by either party prior to the expiration of the initial term or any renewal term upon written notice to the other party in accordance herewith:*
>
> . . . .

American Express Company
May 16, 2006
Page 2 of 4

**CONFIDENTIAL COMMUNICATION**
**FOR SETTLEMENT PURPOSES ONLY**

> *(ii) In the event AMEX terminates this Agreement with HealthExtras and AMEX continues to offer an Accidental Disability Plan, AMEX and HealthExtras agree that for a period of two (2) years immediately following the termination date, HealthExtras will continue to service the Enrollees under the existing terms and conditions of this Agreement, as well as, pass through all fees to AMEX for AMEX' Enrollees acquire under this Agreement.*

AMEX's position appears to be that this language only applies to a so-called "early termination" and that the proposed termination in September is based on an expiration or non-renewal of the contract. The problem with that position is the word "early" appears only in the heading to §18(b) and appears nowhere in subsection (ii). Also, section 20(a) entitled "Headings" negates the argument entirely with the following language:

> 20. *MISCELLANEOUS*:
>
> *(a) Headings: Headings stated in this agreement are for convenience of reference only and are not intended as a summary of such sections and so not affect, limit, modify, or construe the contents thereof.*

Further undermining the "early termination" argument is the fact that there is no "triggering event" under paragraph (ii) that would result in anything other than a termination on the anniversary date of the agreement. In other words there is no "early" date for getting out of the Agreement under §18(b)(ii).

That leaves us with what §18(b)(ii) really says, i.e., if AMEX terminates *and* continues to offer an Accidental Disability Plan, then HealthExtras will continue to service the Enrollees "*under the existing terms and conditions of this Agreement*." We do not know how that language can be construed to mean anything other than the current fee split remains the same. The provision also specifies a two-year period for continuing to operate under the same terms and conditions which HealthExtras points to as the minimum compensation it is due. Finally, even if AMEX and HealthExtras were to engage in a battle of dueling interpretations, the rule of last resort – interpret the Agreement against the drafter, i.e. AMEX – favors HealthExtras.

The next point raised was "AMEX owns the Enrollees." The question to be answered is "what exactly does that mean?" HealthExtras certainly agrees that it should not contact AMEX cardmembers for any purpose other than in connection with the Marketing Agreement. This is consistent with paragraph 4(c) where it states:

> *Ownership of Customer Lists: AMEX shall have all rights and interests to the list of Enrollees and the information contained thereon. HEALTHEXTRAS (1) shall not solicit directly or indirectly Customers or Enrollees for any reason other than in accordance with the terms of this Agreement or as requested in writing by AMEX, and (2) may neither communicate with, nor permit any other persons or entities, including its vendors, agents, representatives, licensees or designees, to communicate with Enrollees without the prior written consent of AMEX.*

American Express Company
May 16, 2006
Page 3 of 4

**CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY**

Nothing in the above language suggests, however, that AMEX also owns the Accidental Disability Program or the fees that flow from it which have been apportioned in accordance with the terms of the existing contract. There are numerous references to HealthExtras owning the Accidental Disability Plan. For example: ¶1(a) ("The "Accidental Disability Plan" or "Plan" shall mean the insurance service to be branded under the name "American Express Accidental Disability Plan" **offered** by HEALTHEXTRAS to Customers in accordance with the terms hereof"); ¶1(b) ("HEALTHEXTRAS hereby agrees **to provide** the Accidental Disability Plan to Customers"); ¶4(e) ("HEALTHEXTRAS represents and warrants that to promote **its** Accidental Disability Plan").

In sum, it is fair to say that arguing that "AMEX owns the Enrollees" to resolve the question of "can AMEX take over HealthExtras' Accidental Disability Plan without compensating HealthExtras" is not helpful. But what does favor HealthExtras' side of the argument (aside from construing the Agreement against the drafter) is Exhibit G, §1, ¶2, which talks about "Developed Materials" and "jointly Developed Materials." The terms Developed Materials and jointly Developed Materials should not be confused with Intellectual Property and whether HealthExtras has a valid claim of ownership to any Intellectual Property.

The concept of Developed Materials is defined much more broadly under the Agreement to include: "All inventions, methods, techniques, works of authorship, computer software, computer upgrades, computer programs, service providers, information, training materials, telemarketing scripts, computer screens, reports, data, any other proprietary or confidential information made, created, developed or written and intellectual property ("Developed Materials")." But, the analysis does not end there. The other key to the provision is who paid to develop the materials. If it was HealthExtras, then "AMEX expressly agrees that Developed Materials paid for entirely by HealthExtras (or any agent of HealthExtras) shall be the property of HealthExtras." And, if both parties spent money on the Developed Materials, then the Agreement provides that: "The foregoing notwithstanding, Developed Materials and/or intellectual property jointly developed by the parties exclusively for use in connection with this Agreement shall not be used by either party (except in relationship to this Agreement) without the express written consent of both AMEX and HealthExtras."

It would be relatively easy to demonstrate that HealthExtras developed and paid, either alone or in conjunction with AMEX, for the majority, if not all, of the items listed as Developed Materials. In sum, the Enrollee ownership argument does not determine this dispute, but the failure to agree on a written contract to use the Developed Materials after the Marketing Agreement is terminated may well be determinative.

Aside from the contract interpretation questions, HealthExtras also takes the position that if AMEX goes forward with its current plan to transition the existing customer base, then HealthExtras will almost certainly pursue a claim under §43(a)(1)(B) of the Lanham Trade-Mark Act, 15 U.S.C.A. §1125(a)(1)(B). HealthExtras continues to offer its Accidental Disability program in the marketplace with marketing partners other than AMEX. If AMEX does not